1

```
 1            IN THE COURT OF COMMON PLEAS
 2         PHILADELPHIA COUNTY, PENNSYLVANIA
 3                      - - -
 4    UNCHALEE VONG et al      :FEBRUARY TERM 03
 5         vs.                 :
 6    MALY YAN et al           :2882
 7                      - - -
 8                Oral deposition of
 9    Maly Yan, taken pursuant to Notice, held
10    at the law offices of Christie, Pabarue,
11    Mortensen & Young Services, 1880 JFK
12    Boulevard, 10th Floor, Philadelphia, PA,
13    on Wednesday, September 24, 2003, at
14    12:45 p.m., before John W. Begley, a
15    Federally Approved Registered
16    Professional Reporter - Notary Public in
17    and for the Commonwealth of Pennsylvania.
18                      - - -
19           ESQUIRE DEPOSITION SERVICES
20                   15th Floor
21        1880 John F. Kennedy Boulevard
22          Philadelphia, Pennsylvania 19103
23               215 - 988-9191
24
```

62

1  is the time card that matches up.
2  She doesn't know that.
3      MR. URBAN: And her
4  confusion and unwillingness to
5  subscribe to the basis for your
6  question, I think, makes the
7  question unfair.
8      MR. VILLALOBOS: Sure.
9      MR. URBAN: I would instruct
10  her not to answer.
11  BY MR. VILLALOBOS:
12      Q. You do recognize the fact
13  that what's been marked as Maly Yan 2 is
14  a time card. Is that fair?
15      A. What I want to know is what
16  day this card show with the punch card.
17      Q. Well, we know that it
18  indicates at the top that it is for the
19  week or the pay period ending June 23,
20  2001.
21      MR. URBAN: Objection to the
22  form of the question.
23      MR. MC NULTY: We don't
24  know. We think. We know that

63

1  that's what you are saying.
2      MR. VILLALOBOS: The
3  document speaks for itself.
4      MR. MC NULTY: Can I --
5      MR. VILLALOBOS: Sure. Go
6  ahead.
7      MR. MC NULTY: Why don't you
8  just ask her what time she clocked
9  out? I'm not trying to tell you
10  how to take your deposition.
11      MR. VILLALOBOS: Sure.
12      MR. MC NULTY: Why don't you
13  ask her whether she punched out
14  before the accident happened?
15  Doesn't that get you to the same
16  answer?
17      MR. VILLALOBOS: Absolutely.
18  I was planning on asking her that,
19  too, so I will just cut to the
20  chase.
21  BY MR. VILLALOBOS:
22      Q. Do you recall if you punched
23  out before the accident took place?
24      A. Yes.

64

1      MR. VILLALOBOS: What I
2  would like to do, then, is have
3  another document marked. This is
4  going to be Maly Yan 3. There are
5  going to be one or two brief
6  questions about this particular
7  document. (Indicating).
8      (The above-referred-to
9  document was marked as Maly Yan
10  Exhibit 3 for identification)
11  BY MR. VILLALOBOS:
12      Q. Go ahead and take a look at
13  that, please.
14      Ma'am, do you recognize this
15  document?
16      A. I'm not so sure.
17      Q. Do you see your signature
18  anywhere on this document?
19      A. Yes, underneath that.
20      Q. And is it dated?
21      A. Yes.
22      Q. And what's the date?
23      A. It was dated August 2, 2001.
24      Q. Above your signature do you

65

1  see where the form asks for your employer
2  and address?
3      A. Yes.
4      Q. And what's listed there as
5  your employer?
6      A. Pack & Process.
7      Q. And beside that it asks for
8  occupation. Do you see what it says
9  under the word "occupation"?
10      A. Yes.
11      Q. And it does not say driver;
12  correct?
13      A. Yes.
14      Q. What I would like to do is
15  ask some questions about June 18, 2001.
16      Did you drive the van to
17  Pack & Process on the morning of June 18,
18  2001?
19      A. Yes.
20      Q. And you also drove the van
21  or you were headed back to Philadelphia
22  after your shift at Pack & Process on
23  June 18, 2001?
24      A. Yes.

**Page 66**

1  Q. Prior to June 18, 2001 on
2  how many occasions had you driven the van
3  to or from Pack & Process?
4  A. Like what do you mean? Can
5  you repeat that?
6  Q. Well, let me ask you this:
7  When did you first begin driving the van?
8  In 2001 when did you first begin driving
9  the van to or from Pack & Process?
10  A. In May.
11  Q. And we are talking about May
12  of 2000, so a month before the accident,
13  roughly?
14  A. Yes.
15  MR. HULLER: I'm sorry,
16  Rafael. That was 2001, I think
17  you meant to say --
18  MR. VILLALOBOS: 2001.
19  THE WITNESS: Yes.
20  BY MR. VILLALOBOS:
21  Q. And why did you start
22  driving the van in May 2001?
23  A. Because my father got his
24  license suspended.

**Page 67**

1  Q. Was your father customarily
2  the person who would drive that van?
3  A. Yes.
4  Q. And was your father paid by
5  someone to drive that van?
6  A. Yes, Lam, Mr. Thatch.
7  Q. And when you began to drive
8  the van in May 2001, a month or so before
9  the accident --
10  A. Yes.
11  Q. -- were you paid by anyone
12  to drive that van?
13  A. I get paid from Pack &
14  Process and I also get paid from Mr. Lam.
15  Q. Now, what were you paid by
16  Pack & Process for: for working as a
17  quality technician or were you paid by
18  Pack & Process to drive the van?
19  MR. URBAN: Objection to the
20  form of the question.
21  Go ahead.
22  THE WITNESS: As a person
23  working as a control.
24  BY MR. VILLALOBOS:

**Page 68**

1  Q. You were not paid by Pack &
2  Process to drive the van in May or June
3  of 2001?
4  MR. URBAN: Objection to the
5  form of the question.
6  THE INTERPRETER: I'm sorry.
7  I wasn't sure she understand the
8  question because the answer --
9  MR. MC NULTY: That's all
10  right. Just translate what she
11  said.
12  THE INTERPRETER: The answer
13  is I get paid from Mr. Thatch as a
14  transporter driving the van,
15  taking people to work there.
16  BY MR. VILLALOBOS:
17  Q. So in May and June of 2001
18  Mr. Thatch was paying you to transport
19  workers between Philadelphia and
20  Wilmington?
21  A. Yes.
22  Q. Did anyone at Pack & Process
23  ever instruct you to drive a vehicle?
24  A. My supervisor told me.

**Page 69**

1  Q. Your supervisor told you to
2  drive a vehicle?
3  A. Yes, transferring people to
4  work and also working as an employee
5  there.
6  Q. What supervisor was it that
7  told you to transport people to and from
8  work?
9  A. Sterling.
10  Q. Sterling Newsome?
11  A. Yes.
12  Q. And when was it that
13  Sterling Newsome told you to drive a van
14  to transport workers?
15  A. After my father got his
16  license suspended.
17  Q. Under what circumstances was
18  it that Sterling Newsome first came to
19  you and spoke to you about driving a
20  vehicle?
21  A. Because he does not want my
22  father to leave the place and he does not
23  want to lose us from the company.
24  Q. So what did Sterling Newsome